**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
ZACHARY SANDERS,

                       Plaintiff,

      -against-

ADAM SZUBIN, Director of the Office of Foreign Assets Control; TIMOTHY GEITHNER, Secretary of the U.S. Department of the Treasury; and ERIC HOLDER, Attorney General, U.S. Department of Justice,

                       Defendants.
------------------------------------------------------------------x

**MEMORANDUM & ORDER**

09-cv-3052 (ENV)

**VITALIANO, D.J.**

    Plaintiff Zachary Sanders brings this action to review final agency action by the Office of Foreign Assets Control ("OFAC"), which operates under the aegis of the Department of the Treasury. Sanders claims violations of his constitutional rights under the Fifth and Eighth Amendments arising from a fine OFAC imposed on him for failure to comply with Cuban trade embargo regulations. He also argues that imposition of the penalty was arbitrary and capricious and, therefore, even if otherwise constitutional, should be set aside pursuant to the Administrative Procedures Act ("APA"), 5 U.S.C. § 706(2)(A).[1] For the reasons stated below, plaintiff's motion for summary judgment is denied in its entirety and defendants' cross-motion for summary judgment is granted.

## BACKGROUND

    The following facts are drawn from the complaint and the submissions of the parties on their motions, including the statement of undisputed material fact filed by both parties pursuant to Local Civil Rule 56.1 ("SUMF"). The facts are construed, as they must be in the summary judgment context,

---

[1] Sanders originally sought an injunction barring OFAC from using certain information-gathering practices as part of his relief. But he abandoned this request in his moving papers.

in the light most favorable to the nonmoving party. See Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc., 473 F.3d 450, 456 (2d Cir. 2007). Any factual disputes are noted as necessary.

A. <u>The Creation and Enforcement of the Cuban Trade Embargo</u>

In 1963, the United States imposed a trade embargo on Cuba. This policy of commercial isolation was implemented by the Cuban Assets Control Regulations ("the regulations"), as amended, 31 C.F.R. Part 515. See Havana Club Holding, S.A. v. Galleon, S.A., 203 F.3d 116, 120 (2d Cir. 2000). The regulations were promulgated pursuant to § 5(b) of the Trading with the Enemy Act of 1917, 50 U.S.C. App. §§ 1–44 ("TWEA"); see also 12 U.S.C. § 95a. In 1996, Congress enacted the Cuban Liberty and Democratic Solidarity Act, 22 U.S.C. § 6021, et seq. (1996), which, among other things, re-codified the regulatory regime, 22 U.S.C. § 6032(h). See also Havana Club, 203 F.3d at 120. Throughout all incarnations, OFAC has been tasked with administering the trade restrictions. See 50 U.S.C. App. §§ 1-44; 31 C.F.R. Part 515; see also 22 U.S.C. § 6009(a).

In one iteration or another, for nearly 50 years, the Cuban embargo has sought to deter commercial and financial dealings between Cuba and the United States, that is, any transactions in which Cuba has "any interest of any nature whatsoever, direct or indirect." 31 C.F.R. § 515.201(a). For example, in 1963 TWEA provided in pertinent part:

> During the time of war or during any other period of national emergency declared by the President, the President may, through any agency that he may designate . . .
>
> (A) investigate, regulate, or prohibit, any transactions in foreign exchange, transfers of credit or payment between, by, through, or to any banking institution . . . and
>
> (B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest . . . .

50 U.S.C. App. § 5(b)(1) (1963); see Hausler v. JP Morgan Chase Bank, N.A., 740 F. Supp. 2d 525,

527 (S.D.N.Y. 2010). In 1977, Congress passed the International Emergency Economic Powers Act ("IEEPA"), which amended § 5(b) so as to remove the statutory authorization anchored to national emergency situations declared in peacetime. See 50 U.S.C. § 1701; see also Hausler, 740 F. Supp. 2d at 527. Although presidential power to issue sanctions and order blockades in peacetime has been recast by the IEEPA, Cuban embargo orders issued pursuant to § 5(b) prior to 1977 remain in effect as authorized by a savings clause in the 1977 Act. On this basis, the regulations also have been reauthorized each year since 1977. See Hausler, 740 F. Supp. 2d at 527.

Essential to America's continued embargo against Cuba is the imperative, enforceable by criminal and civil penalties, that individuals subject to the jurisdiction of the United States may not engage in transactions related to travel to, from, or within Cuba in the absence of a license issued by OFAC. 31 C.F.R. §§ 515.201. Specifically, OFAC may impose civil penalties of up to $65,000 for violations of the regulations. 31 C.F.R. § 501.701(a)(3); 50 U.S.C. App. § 16(b). Moreover, failure to respond to information requests from OFAC regarding suspected embargo violations can result in fines up to $10,000, 31 C.F.R. § 501.602; 68 Fed. Reg. 4422, 4427 (Jan. 29, 2003), and, where violations are willful, violators are subject to criminal prosecution and fines up to $100,000 and a maximum prison sentence of ten years. 31 C.F.R. § 501.701(a)(1); 50 U.S.C. App. § 16.[2]

B. Material Facts Are Undisputed

In November 1998, OFAC received information from then-United States Customs Service officials posted in Nassau, The Bahamas suggesting that plaintiff had traveled to Cuba without an OFAC license five months earlier. (SUMF ¶ 3.) On March 1, 2000, OFAC sent Sanders a Requirement to Furnish Information ("RFI"), which demanded that he provide a written, detailed report concerning his suspected trip to Cuba. The RFI included a letter describing the alleged travel violations, two pages of questions regarding the targeted travel, and a copy of relevant regulations.

---

[2] At the time, TWEA penalties were promulgated at 31 C.F.R. § 515.701 (1999).

3

The RFI also advised Sanders that he was required to respond within 20 business days and that failure to do so could result in civil penalties. (Id. ¶¶ 4-5.) Despite several communications from Sanders to OFAC requesting extensions of time to respond—which were granted—Sanders never did respond to the RFI. (Id. ¶¶ 6-8.)

On February 13, 2002, OFAC issued a Prepenalty Notice ("PPN") to Sanders. It gave Sanders warning that OFAC intended to impose a civil fine of $10,000 for his failure to respond to the RFI. The PPN also advised Sanders that he was entitled, upon his request, to an administrative hearing prior to the formal imposition of a penalty. In reply, Sanders requested a hearing as well as prehearing discovery. (Id. ¶ 9-10.) He also indicated his desire to resolve the matter through informal settlement. (Id.) On April 29, 2002, an attorney for Sanders submitted a supplementary response to the PPN, renewing Sanders' request for a hearing and prehearing discovery. In his supplementary response, plaintiff asserted, for the first time, that OFAC's threatened fine implicated the Fifth Amendment—it was raised without elaboration. (Id. ¶ 11.)

A period of seeming repose followed this flurry of activity. Almost three years later, battle resumed on February 28, 2005, when OFAC issued an Order Instituting Proceedings ("OIP") against Sanders. In his answer, filed on April 20, 2005, Sanders sought specified refuge in the Fifth Amendment, contending that OFAC's proposed fine violated his right to be free from compelled self-incrimination. (Id. ¶¶ 13-14, 17.) Cross-motions for summary judgment were noticed. After a hearing, an administrative law judge issued a decision, on September 4, 2008, rejecting plaintiff's Fifth Amendment argument, but recommending a penalty of $1000 rather than the $9000 sought by OFAC.[3] (Id. ¶¶ 18-20, 23.)

Both sides filed petitions for agency review of the ALJ's decision by the Treasury Secretary's designee, each assigning error in the ALJ's decision in not granting the full relief each originally

---

[3] OFAC had previously filed a motion to amend the OIP to request a $9000 penalty, a thousand dollars less than originally proposed. (Id. ¶ 19.)

4

demanded.[4] (Id. ¶¶ 24-25.) On January 16, 2009, the Secretary's designee issued a Determination and Order modifying the penalty amount to $9000 and explaining his decision.[5] (Id. ¶¶ 27-28.) Plaintiff brought this action on July 16, 2009, challenging imposition of the $9000 penalty on Fifth and Eighth Amendment grounds, as well as asserting that the upward modification of the penalty on agency review was arbitrary and capricious.

## STANDARDS OF REVIEW

A district court must grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986). The court's responsibility in assessing the merits of a summary judgment motion is not to try issues of fact, but rather to "determine whether there *are* issues of fact to be tried." Sutera v. Schering Corp., 73 F.3d 13, 15-16 (2d Cir. 1995) (quoting Katz v. Goodyear Tire & Rubber Co., 737 F.2d 238, 244 (2d Cir. 1984)). The moving party bears the burden of demonstrating that there is no genuine issue as to any material fact, see Jeffreys v. City of N.Y., 426 F.3d 549, 553 (2d Cir. 2005), and the court will resolve all ambiguities and draw all permissible factual inferences in favor of the party opposing the motion, see Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004); Gummo v. Vill. of Depew, 75 F.3d 98, 107 (2d Cir. 1996).

If the moving party meets its initial burden of demonstrating the absence of a disputed issue of material fact, the burden shifts to the nonmoving party. See Niagara Mohawk Power Corp. v. Jones

---

[4] The regulations vest broad discretion in the Secretary's designee both as to whether to review an ALJ's determination and the scope of review to be applied. See 31 C.F.R §§ 501.741 & 501.742. The regulations commit this review to the Secretary's designee's discretion as such review "is not a right." 31 C.F.R. § 501.741(a)(1)(i).

[5] The Secretary's designee issued his Determination and Order in accordance with an earlier order announcing that he would exercise his discretion to review only the ALJ's ruling on the appropriateness of the penalty imposed and would not consider any other matters raised by the parties. (Id. ¶ 26.)

5

Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003). The nonmoving party may not rely solely on "conclusory allegations or unsubstantiated speculation" in order to defeat a motion for summary judgment. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). Instead, the nonmoving party must "make a showing sufficient to establish the existence of [each] essential element to that party's case . . . . [s]ince a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 322-23. If the evidence favoring the nonmoving party is "merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S. Ct. 2505 (1986) (internal citations omitted).

In reviewing an agency's disposition of constitutional issues, a district court need not defer to the agency's decision; in fact, it must engage in a de novo review. Cablevision Sys. Corp. v. FCC, 570 F.3d 83, 91 (2d. Cir. 2009). However, when reviewing agency action under 5 U.S.C. § 706(2)(A), the review is deferential and, although a reviewing court "must hold unlawful and set aside any agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," Karpova v. Snow, 497 F.3d 262, 267 (2d Cir. 2007), the scope of this review is "narrow," id., and courts should not substitute their judgment for that of the agency under review, Motor Vehicle Mfrs. Ass'n of U.S., Inc v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S. Ct. 2856 (1983). Balancing these interests, a court should only overturn an agency's determination if that agency

> has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Id. "[S]o long as the agency examines the relevant data and has set out a satisfactory explanation including rational connection between the facts found and the choice made," the agency's determination should be upheld. Karpova, 497 F.3d at 268.

6

## **DISCUSSION**

A. <u>The Fifth Amendment Claim</u>

The contention is simple: Sanders argues that his nonresponse to the RFI was an exercise of his right not to incriminate himself because the act of responding, in and of itself, would have been incriminating—regardless the response. Therefore, so the argument goes, OFAC's imposition of a fine on him is an unconstitutional punishment since it effectively punished him for the mere valid exercise of his right not to testify against himself. The government retorts that, putting aside any theoretical Fifth Amendment immunity for his nonresponse, Sanders did not actually invoke his privilege against self-incrimination at the time he failed to respond and, as a result, waived the privilege. Defendants contend OFAC simply fined Sanders for his utter and unexcused failure to respond to the RFI. Plaintiff replies that, recognizing the general rule requiring an affirmative invocation of the privilege, his decision to remain silent fits within a limited exception to the general rule, that is, affirmative invocation of the privilege is excused where individuals face the option of either (a) invoking the privilege and facing a penalty or indirectly incriminating themselves by having done so, or (b) making self-incriminating disclosures to avoid the penalty but then exposing themselves to potential criminal charges. The argument is predicated on a line of Supreme Court cases arising from federal tax law enforcements related to income generated by marijuana trafficking and illicit gambling, see <u>Leary v. United States</u>, 395 U.S. 6, 89 S. Ct. 1532 (1969); <u>Marchetti v. United States</u>, 390 U.S. 39, 88 S. Ct. 697 (1968); <u>Grosso v. United States</u>, 390 U.S 62, 88 S. Ct. 709 (1968), and another line arising out of registration regulations for members of the Communist Party, <u>Albertson v. Subversive Activities Control Bd.</u>, 382 U.S. 70, 86 S. Ct. 194 (1965).

The issue is ripe for summary judgment given that, as to these claims, the material facts are not in dispute. Those facts are: first, Sanders never submitted any answers to the individual questions set forth in the RFI (indeed, he never responded at all until OFAC issued the PPN). (SUMF ¶ 8, 10.)

7

Second, prior to the penalty phase of the proceedings, Sanders had made no mention whatsoever of his privilege against self-incrimination. Lastly, OFAC did impose a civil penalty on Sanders solely because of his nonresponse—a silence he claims was constitutionally privileged.

*Invocation by Silence*

"To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled." Hiibel v. Sixth Judicial Dist. Ct. of Nev., Humboldt Cnty., 542 U.S. 177, 189, 124 S. Ct. 2451 (2004). The privilege extends to "'any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used.'" Id. (quoting Kastigar v. United States, 406 U.S. 441, 445, 92 S. Ct. 1653 (1972)). For testimony to be incriminating, there must be "reasonable ground to apprehend danger to the witness from his being compelled to answer . . . . [T]he danger . . . must be real and appreciable, with reference to the ordinary operation of law in the ordinary course of things." Hiibel, 542 U.S. at 190 (quotations omitted).

The privilege against self-incrimination "serves two primary interrelated facets: The Government may not use compulsion to elicit self-incriminating statements . . . and the Government may not permit the use in a criminal trial of self-incriminating statements elicited by compulsion." Murphy v. Waterfront Comm'n of N.Y. Harbor, 378 U.S. 52, 57 n.6, 84 S. Ct. 1594 (1964). While the text of the amendment only creates a right not to testify at one's own criminal trial, the privilege extends to allow a refusal to answer "official questions . . . in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate [the questioned individual] in future criminal proceedings." Minnesota v. Murphy, 465 U.S. 420, 426, 104 S. Ct. 1136 (1984) (quotations omitted). The privilege, however, does not (textually or otherwise) dispense with "the general obligation to appear and answer questions truthfully." Id. at 427. As the Supreme Court has noted, "nothing in our prior cases suggests that the incriminating nature of a question, by itself, excuses a timely assertion of

8

the privilege." Id. at 428.; see also Hiibel, 542 U.S. at 191 ("Even witnesses who plan to invoke the Fifth Amendment answer when their names are called to take the stand."); Garner v. United States, 424 U.S 648, 654 n.8, 658 n.11, 96 S. Ct. 1178 (1976); United States v. Sullivan, 274 U.S. 259, 263, 47 S. Ct. 607 (1927); United States v. Clark, 574 F. Supp. 2d 262, 267 (D. Conn. 2008) (citing United States v. Fox, 721 F.2d 32, 40 (2d Cir. 1983)).

The Supreme Court's decision in United States v. Sullivan is instructive. Stemming from a prosecution for failure to file a tax return, the defendant claimed there that the Fifth Amendment protected him from having to file a return because his return would reflect profits from "illicit traffic in liquor." 274 U.S. at 263. In holding that the defendant could be constitutionally prosecuted for failing entirely to file a return, Justice Holmes made clear that the privilege against self-incrimination must be affirmatively asserted as to the each relevant question:

> In the decision [below] that [requiring a return to be filed] was contrary to the Constitution we are of the opinion that the protection of the Fifth Amendment was pressed too far. If the form of return provided called for answers that the defendant was privileged from making he could have raised the objection in the return, but could not on that account refuse to make any return at all.

Id. See also United States v. Josephberg, 562 F.3d 478, 492-93 (2d Cir. 2009) (holding that the "Fifth Amendment does not provide a blanket defense for a failure to file tax returns," even in the midst of an ongoing criminal tax investigation); United States v. Egan, 459 F.2d 997, 998 (2d Cir. 1972) (the "privilege would relate only to [a] refusal to respond to a question, not to a total failure to file a return. The fifth amendment protects against giving testimony against oneself, not bringing attention to oneself.") Given a nonincriminating opportunity to invoke the privilege, silence in the form of failure to file a return will not suffice.

Clearly, to be sure, there is also a limited exception to that general rule. Leary v. United States recognized that where the act of compliance with a registration requirement would subject an individual to the possibility of criminal liability, the Fifth Amendment privilege against self-

9

incrimination was a defense to prosecution for failing to comply with that registration requirement. 395 U.S. at 18-19. Leary involved a federal occupational tax on marijuana traffickers. Id. at 14-15. The statutes at issue obligated those employed in the marijuana trade and transferees of marijuana to register their names and places of business with the Internal Revenue Service. Id. At the time, state drug laws made possession and sale of marijuana a criminal offense. Id. at 16-17 & n.14. Timothy Leary, having been found in possession of marijuana, was collaterally prosecuted for failing to comply with the registration statutes. Id. at 10-11. Justice Harlan laid out the problem concisely: the tax registration provisions "required [Leary] . . . to *identify* himself not only as a transferee of marijuana but as a transferee who had not registered and paid the occupational tax." Id. at 16 (emphasis added). As a result, "[s]ince compliance with the transfer tax provisions would have required petitioner unmistakably to *identify* himself as a member of a selective and suspect group, we can only decide that when read according to their terms, these provisions created a real and appreciable hazard of incrimination." Id. at 18 (emphasis added). Leary's failure to affirmatively assert his Fifth Amendment privilege was therefore excused in favor of silence because the very act of assertion (as with the act of registration), would have *identified* him as one who might be subject to state narcotics laws.

The Court applied similar reasoning in Marchetti v. United States and Grosso v. United States. The Fifth Amendment, both cases held, was a defense to prosecution for failure to file tax returns that would reflect occupational and excise taxes on gambling since operating a wagering enterprise was a crime in virtually every state. Marchetti, 390 U.S. at 54; Grosso, 390 U.S. at 68; see also Leary, 395 U.S. at 12-13. Similarly, in Albertson v. Subversive Activities Control Board, the Court held that individuals were privileged, under the Fifth Amendment, not to file registration forms identifying themselves as members of the Communist Party. 382 U.S. at 79. As in Leary, Marchetti, and Grosso, the Court came to this result because the privilege was being asserted "against an inquiry in an area

10

permeated with criminal statutes, where response to any of the form's questions . . . might involve the petitioners in the admission of a crucial element of a crime." Albertson, 382 U.S. at 79. Thus, in Albertson, the Fifth Amendment acted not only to prevent compulsion to answer any single question on the registration form, but also to excuse the filing of the form itself. In each case, any response (regardless of its content) would, alone, tend to incriminate. No response—silence—was the only effective way to invoke the privilege against self-incrimination.

Stated differently, specific question-by-question invocation of the privilege is excused only when any compliance or acknowledgment of the applicability of a governmental reporting requirement would itself *identify* an individual as involved in an activity that could potentially subject the respondent to criminal prosecution.

Sanders seeks shelter in the exception, arguing that response to the OFAC inquiry was tantamount to self-incrimination and that the silence of nonresponse was sufficient to invoke the privilege. The argument is fatally flawed. First, the invocation by silence cases all involved not only a general inquiry by government, but one to which any response would identify the responder as a likely criminal actor and expose that responder to some type of criminal jeopardy. Leary, 395 U.S. at 12-13 (trafficking of marijuana); Marchetti, 390 U.S. at 42 (gambling); Grosso, 390 U.S. at 65 (gambling); Albertson, 382 U.S at 78 ("subversive activities"). In each, the triggering act of government launched a dragnet that would ensnare *unknown* and *untargeted* individuals by forcing them to make responses that would self-identify and self-target them, but, more importantly, would likewise self-identify them for criminal investigation merely by acknowledging (through invocation of their privilege against self-incrimination) that the dragnet information request applied to them. See Garner, 424 U.S. at 658 n.11.

The RFI confronting Sanders presented no such Hobson's Choice. Question-by-question invocation of the privilege would not have identified Sanders as a random member of the general public involved in possible criminal activity (i.e., violations of the embargo). Indeed, the contents of

11

the RFI sent to Sanders confirmed that OFAC was already aware of his identity and had targeted him for investigation regarding his suspected trip to Cuba. Unlike in the invocation by silence cases, where any response would ensnare the random and covert actor in a net sealed tightly by self-identification alone—and thus expose responding actors to "a real and appreciable hazard of incrimination", Leary, 395 U.S. at 18 (quotation omitted)—Sanders received a questionnaire sent to him and only to him because he had been identified and targeted *already*. Responding to the RFI with ordinary question-by-question invocation of his Fifth Amendment privilege against self-incrimination would have done nothing more than verify his existence and certify his receipt of the RFI.[6] With self-targeting not an issue, putative silent invocation of the Fifth Amendment is no life line.

The facts and the conclusion are certainly plain. OFAC's request here was specifically directed at Sanders and Sanders alone in a written communication identifying him by name and address. Traditional invocation of the privilege would have added nothing to OFAC's identification of him as a potential target of investigation. The short of it is that Sanders was lawfully entitled to confound OFAC's investigation of him, but only to the extent that he was entitled to withhold relevant information that would incriminate him. He could not, however, protect himself by silently ignoring the demand for information. Compliance with traditional question-by-question invocation of his Fifth Amendment privilege was required.

Obviously, Sanders, it is not disputed, failed to do that. He did not assert his Fifth Amendment privilege to any of the questions in the RFI. Sanders was not authorized by the amendment to "draw a conjurer's circle around the whole matter by his own declaration that to write any word upon the government blank would bring him into danger of the law." Sullivan, 274 U.S. at 264. By his failure to invoke his privilege against self-incrimination, Sanders waived it. As a consequence, OFAC was not barred by the Fifth Amendment from penalizing him for his refusal to respond in any way to the

---

[6]Sanders himself already authenticated these two facts without objection by contacting OFAC to request more time in which to respond to the RFI. (SUMF ¶ 6.)

12

RFI issued pursuant to its lawful regulatory authority to compel such responses.[7]

B. The Eighth Amendment Claim

Attacking on another flank, plaintiff argues that OFAC's imposition of a $9000 fine is unconstitutional as prohibited by the Excessive Fines Clause of the Eighth Amendment.

Unlike with its Eighth Amendment companion, the Cruel and Unusual Punishment Clause, the Supreme Court "has had little occasion to interpret, and [until 1998 had] never actually applied, the Excessive Fines Clause." United States v. Bajakajian, 524 U.S 321, 327, 118 S. Ct. 2028 (1998). Pointedly, the Second Circuit has taken specific note of the "dearth of relevant case law." Von Hofe v. United States, 492 F.3d 175, 183 (2d Cir. 2007). But slim as it is, there is guidance.

"The Excessive Fines Clause limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense." Austin v. United States., 509 U.S. 602, 609-10, 113 S. Ct. 2801 (1993) (quotations omitted). "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the [fine] must bear some relationship to the gravity of the offense." Bajakajian, 524 U.S at 334; United States v. Castello, 611 F.3d 116, 120 (2d Cir. 2010). While there is no requirement of "strict proportionality," a fine or "punitive forfeiture violates the . . . [c]lause if it is grossly disproportional to the gravity of the" offense. Bajakajian, 524 U.S. at 334, 336; see also United States v. Gurley, 384 F.3d 316, 325 (6th Cir. 2004) (citing Bajakajian, 524 U.S. at 334) (holding that a fine of $1,908,000 levied by the EPA for a defendant's long-term failure to respond to an information request was not "grossly disproportional" to the offense).

To begin, as objector, plaintiff bears the burden to prove disproportionality. See Castello, 611 F.3d at 120.[8] In Castello, the Second Circuit laid out four factors—"distilled from Bajakajian"—to

---

[7] OFAC's regulatory authority to issue an information request is not challenged in this action.

[8] Defendants concede that the fine levied by OFAC is, at least in part, punitive and thus is properly considered within the ambit of the Eighth Amendment's prohibition of "excessive" fines. See

13

guide the constitutional analysis:

> [1] the essence of the crime of the defendant and its relation to other criminal activity, [2] whether the defendant fit[s] into the class of persons for whom the statute was principally designed, [3] the maximum sentence and fine that could have been imposed, and [4] the nature of the harm caused by the defendant's conduct.

Id.[9]

Constitutional analysis of punishment starts with the sin. The essence of the violation by Sanders was his willful failure to report information sought by OFAC in connection with plaintiff's suspected trip to Cuba, and not any unlawful travel to Cuba itself. No matter how great or minor would have been the report Sanders refused to make, the RFI sent to him was part of a complex regulatory scheme administered by OFAC. That scheme, embedded in a decades-old foreign policy of the United States, requires large volumes of information to allow OFAC to properly, fairly, and efficiently carry out its administrative duties in enforcing the embargo of Cuba. For this reason, federal regulations promulgated under TWEA grant OFAC the power to demand, under penalty of a civil fine, information from all covered individuals and entities having dealings with Cuba regarding compliance with the embargo. See 50 U.S.C. App. § 16; 22 U.S.C. § 6009(d); 31 C.F.R. § 501.602; 68 Fed. Reg. at 4427. Without such penalty power and without across the board resort to it to impose penalties, compliance would quickly wither and, obviously, the cumulative effects of nonenforcement and noncompliance would eviscerate OFAC's ability to administer the embargo. Raising the ante, outright defiance of the obligation to respond to demands for information, no matter how small the covered contact with Cuba, decidedly warrants civil punishment as provided by the statute and regulations if OFAC's administrative process is to remain viable. Critically, that is the case here. As

---

Bajakajian, 524 U.S. at 328.

[9] Unlike the administrative fine here, Bajakajian and Castello both involved criminal forfeitures following the defendant's conviction under a financial reporting statute. Bajakajian, 524 U.S. at 337; Castello, 611 F.3d at 124. Nonetheless, the Bajakajian factors represent an appropriate guide to decision.

14

is clear from the record (and plaintiff points to no evidence to the contrary), Sanders willfully neglected to respond to the RFI. Nor, as demonstrated above, did he invoke any right or privilege excusing his failure. In weighing proportionality, the sin—substantively and procedurally—is serious.[10]

Second, it is equally clear Sanders falls squarely within the class TWEA and the regulations were designed to oversee. TWEA expressly contemplates individualized enforcement without regard to the size or number of transactions. See 50 U.S.C. App. § 16; 22 U.S.C. § 6009. Sanders not only was subject to the regulatory regimen he violated, he was put on notice by the RFI itself that the failure to respond would subject him to civil penalties. (See Administrative Record ("A.R.") 000279.) Proportionality finds comfort when the violator is a regulated person and notice of the potential penalty is unequivocal, as is the case here.

Third, the maximum fine Sanders could have suffered was higher than the $9000 imposed. At the time of his offense, TWEA and the regulations set the maximum relevant civil penalty at $55,000. 61 Fed. Reg. 54936 (Oct. 23, 1996).[11] Parallel regulations stated that each failure to respond to an RFI would generally result in a proposed fine of $10,000. 68 Fed. Reg. at 4427. In setting the parameters of proportionality, the Supreme Court has "emphasized . . . that judgments about the appropriate punishment for an offense belong in the first instance to the legislature." Bajakajian, 524 U.S. at 336. The fine imposed here not only fits well within the statutory scheme, it is also less than the fine contemplated by the regulations. The fine, of course, is not de minimus, nor would one expect a de minimus fine given the deliberateness and willfulness of the violation. This too, under the Second

---

[10] Sanders' disingenuous denial, in his initial response to the PPN, that he ever received the RFI is directly contradicted by his own concession in the parties' joint Rule 56.1 Statement that he called OFAC "and asked for additional time to respond to the RFI." (SUMF ¶ 6.) It follows that there is no genuine dispute as to whether Sanders in fact received the RFI.

[11] Although the text of TWEA fixes the fine at $50,000, subsequent statutes require OFAC to adjust this number for inflation periodically. See 61 Fed. Reg. at 54936.

15

Circuit test, supports a finding of proportionality.

Finally, it is important for entities imposing fines to assess, and for the fine to match, the "harm" caused by the transgression. Here, it is true no individuals were harmed by Sanders' failure to answer the RFI. No money or other assets were lost or stolen. The only harm suffered by OFAC was its inability to obtain information about contacts with Cuba and then to build a case against Sanders (which he might have blunted by proper invocation of the Fifth Amendment anyway). So, in short, there was some harm. It was a generalized harm in that the very responses the statute directed OFAC to secure were willfully frustrated by Sanders. Objectively, as in Bajakajian, failure to respond to the information request "affected only one party, the Government, and in a relatively minor way," 542 U.S. at 339, when viewed practically. Certainly however, a lack of a more "tangible" harm does not excuse plaintiff's violation or hold him harmless from any penalty. This factor merely serves as a bulwark against untoward severity. It is at best a meter, not a breaker short-circuiting all punishment.

There can be little doubt that Sanders' willful violation of OFAC's regulations is precisely the type of behavior to be deterred by the penalty provisions of TWEA and its implementing regulations. Balancing the willfulness of the violation with the purpose and importance of the regulatory scheme, leavened by the likelihood of little substantive harm to the government, proportionality is honored and the Excessive Fines Clause of the Eighth Amendment is unabridged. See Gurley, 384 F.3d at 325 (quotations omitted) (citing Bajakajian, 524 U.S. at 334). The claim fails.

C. The APA Claim

Without derogation of his constitutional claims (now rejected), Sanders argues that OFAC's decision to increase the ALJ's $1000 penalty to $9000 was not only arbitrary and capricious, but also specifically contravened the APA because (a) it was slow in coming, (b) the Secretary's designee did not review every aspect of the ALJ's decision, and (c) no rationale can be discerned for the action

16

taken. There is no merit in these specifications of error.[12]

It is fundamental that a person aggrieved by agency action is entitled to judicial review of that final agency decision (and to any appropriate relief). This review, however, is highly deferential: "so long as the agency examines the relevant data and has set out a satisfactory explanation including rational connection between the facts found and the choice made," the agency's determination will be upheld. Karpova, 497 F.3d at 268. Even if OFAC's reasoning were not crystal clear, deference is still owed, "provided the agency's path to its conclusion may reasonably be discerned." Id.

Sanders' initial assertion that OFAC's prosecution and final penalty decision were, because of untimeliness, arbitrary and capricious is spurious at best. Accepting at face value his disparagement of OFAC's proceeding against him as slow and incompetent, Sanders makes no claim of prejudice to himself from the delay.[13] Moreover, plaintiff cannot offer a single case suggesting that delay alone is tantamount to arbitrary and capricious agency action. Indeed, the prevailing rule is just the opposite: delay will not support setting aside an otherwise lawful agency action. See Office of Foreign Asset Control v. Voices in the Wilderness, 382 F. Supp. 2d 54, 60 & n.4 (D.D.C. 2005); Breyer v. Meissner, 23 F. Supp. 2d 540, 548 (E.D. Pa. 1998).

The second and third prong of plaintiff's APA argument—that the Secretary's designee failed to review every aspect of the ALJ's decision and that the final decision lacked a rational basis—will be considered together. Off the start, "[r]eview of the decision of the Administrative Law Judge by the Secretary's designee is not a right." 31 C.F.R. § 501.741(a)(1)(i). The Secretary's designee is accorded broad discretion on such appeals. Id. at § 501.741(a)(1)(ii)(B)(3). The failure to grant

---

[12] Per force, if the $9000 penalty imposed on review by the Secretary's designee does not violate the Eight Amendment, nor would the $1000 fine recommended by the ALJ. The increase in penalty on review raises no question of constitutional dimensions.

[13] In fact, according to plaintiff's account, the only party adversely affected by any delay was OFAC itself, which acted so slowly that it apparently ran the statute of limitations applicable to any possible substantive violation of the regulations flowing from possible related embargo violations.

17

discretionary review or, where granted, to limit the issues on review at the highest agency level still leaves an aggrieved party a chance at judicial review of the final agency action (here, the imposition of a fine) regardless of whether that final action results from an ALJ's decision, the Secretary's designee's, or a combination of the two. See id. at § 501.742(a); 5 U.S.C. § 551(13) (agency action "includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent" thereof). Indeed, "[u]nless the Secretary's designee determines to review a decision . . . , the decision of the Administrative Law Judge shall become . . . final" and ripe for judicial review. 31 C.F.R. § 501.740(c).

As with the other claims, no material facts are in dispute. On September 4, 2008, the ALJ's decision rejected the constitutional defenses interposed by Sanders and levied a $1000 fine. (SUMF ¶ 23; A.R. 000582-88.) Just short of two months later, on October 24, 2008, the Secretary's designee determined that the ALJ's decision contained "an exercise of discretion or decision of law or policy which [he] should review." (A.R. 000605). In less than 90 days, on January 16, 2009, the Secretary's designee issued his Determination and Order upwardly modifying the penalty amount to $9000, (SUMF ¶ 28; A.R. 000631-35), finding that the ALJ had "erred as a matter of both law and policy by reducing the penalty against" Sanders for his failure to respond and that the "public interest is not served by reducing the penalty for failure to furnish information sought by" OFAC. (A.R. 000631.) The Secretary's designee provided analysis of the facts and regulations he determined to be relevant to the penalty imposed. He also noted the arguments from both Sanders and OFAC, including a recital of the mitigating (e.g., first offense) and aggravating (e.g., willful violation) factors that informed the ALJ's decision. (Id. at 000633-34.) The Secretary's designee then reasoned that affirming the $1000 penalty would create only a "modest penalty for refusing to fill out a lawful form," which could incentivize "future sanction violators . . . to ignore the form entirely as a way to make it more costly and less likely for OFAC to prove the underlying violation which would certainly bring a much higher

penalty." (Id. at 000634.) "The violator would reason that the penalty for disregarding the form is so low relative to the penalty for violating the sanction that ignoring the form is a good gamble." (Id.) Then, after recapitulating the policy position that OFAC's mission to administer the Cuban embargo necessitates the gathering of information, the Secretary's designee concluded that "OFAC's proposed penalty of $9000 [was] appropriate to prevent a perverse incentive to avoid filling out a lawful form by making the penalty low relative to the penalty for the underlying violation." (Id.)

The reasoning offered by the Secretary's designee is sufficiently clear and in conformity with the agency's applicable rules and policy for such penalty proceedings. See 68 Fed. Reg. at 4427. In fact, the Secretary's designee made specific reference to OFAC's enforcement guidelines, see id. at 4426-27. All in all, it is clear that the Secretary's designee "examine[d] the relevant data" and rationally connected the facts found, OFAC's policies, and the controlling legal standard as he was obligated to do. See Karpova, 497 F.3d at 268. Even though the determination is relatively brief, it is logical, understandable, and complete. It most certainly is not arbitrary, capricious, and unreasonable. The "path to [OFAC's] conclusion may reasonably be discerned" without doubt. Id. Moreover, since OFAC's "duty [was] to account for its actions," Cablevision, 570 F.3d at 92, and "to explain its ultimate action," the agency "need not explain each and every step leading to [its] decision." Id. Where, as here, the agency has set out legitimate facts upon which it has based reasoning guided by statute, its own rules, and reasonably exercised discretion, neither the Secretary's designee nor the ALJ needs "to sift through each piece of evidence offered by a party and explain why it is more or less compelling than the counter-evidence put forth by an opponent." Id. Case law, bluntly, renders plaintiff's lament about incomplete review by the Secretary's designee immaterial and his argument baseless. Sanders is entitled to review of the agency's final action and the reasons for it as expressed in the decision of the ALJ as modified by the Secretary's designee. And on that review, the Court finds that OFAC's imposition of a $9000 penalty for his willful failure to respond to an RFI was not

19

arbitrary and capricious. There being no violation of the APA, OFAC's final agency action must be affirmed.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is denied in its entirety.

Defendants' cross-motion for summary judgment is granted.

The Clerk is directed to enter judgment in accordance with this Memorandum and Order and to close the case.

**SO ORDERED**

Dated: Brooklyn, New York
       December 6, 2011

                                        s/ ENV
                                        _____
                                        ERIC N. VITALIANO
                                        United States District Judge